1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

### EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| JOHN E. THOMAS, | ) 1:11-cv-01291-SKO |
| | ) |
| | ) **ORDER REGARDING PLAINTIFF'S** |
| Plaintiff, | ) **SOCIAL SECURITY COMPLAINT** |
| | ) |
| v. | ) (Doc. 1) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

18

19

### BACKGROUND

20    Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the

21 "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB")

22 pursuant to Title II of the Social Security Act (the "Act").  42 U.S.C. § 405(g).  The matter is

23 currently before the Court on the parties' briefs, which were submitted, without oral argument, to the

24 Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

25

26

27

28

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 9, 11.)

**FACTUAL BACKGROUND**

Plaintiff was born in 1957, has a high school education, attended college for three years, and previously worked as a utility clerk for Pacific Gas & Electric ("PG&E"). (Administrative Record ("AR") 31, 34, 45.)  On July 9, 2008, Plaintiff filed an application for DIB, alleging disability beginning September 14, 2007, due to degenerative disc disease in his back and a meniscus tear in his left knee. (AR 15, 159.)

**A.     Medical and Employment History**

Plaintiff began to have back trouble in 1985 after suffering an injury causing herniated discs in his lumbar spine. (AR 37, 40, 159.) Although his doctors informed him that he would not be able to work again, Plaintiff rehabilitated his back until he was able to return to work. (AR 37.) Plaintiff worked until 1994 or 1995, but he began to experience trouble standing and sitting due to lower back pain. (AR 41.)  As a result, Plaintiff began to use a camping stool at work on which he could kneel instead of sitting. (AR 37, 41.)  Specifically, Plaintiff would alternate from his left knee to his right knee on the camping stool and would then move to a standing position. (AR 41.)  His employer determined that the stool Plaintiff was using needed to be replaced with a kneeling chair which Plaintiff proceeded to use for 10 years. (AR 37, 41.)  However, Plaintiff reported that using the kneeling chair aggravated his knees. (AR 41.)

According to his employer's personnel records, in November 2004, an outside consultant provided a workstation assessment for Plaintiff. (AR 216.)  It was noted that, at the time, Plaintiff was using a kneeling chair due to back issues. (AR 216.)  Although the outside consultant recommended that Plaintiff use a "sit/stand" keyboard tray and monitor lift, and PG&E ordered this equipment, it was not possible to use it at Plaintiff's workstation due to installation problems. (AR 216.) Accordingly, Plaintiff continued a combination of kneeling and standing to wait on customers. (AR 216.)

After complaints of knee pain in 2007, Plaintiff was referred by his primary physician to a specialist in orthopedic surgery, Mark Schamblin, M.D. (AR 230-31.)  Plaintiff presented for evaluation of his left knee on August 27, 2007, complaining of left knee pain beginning two to three months prior to the examination. (AR 230.) On examination, Dr. Schamblin found Plaintiff to have

a gait within normal limits, and no evidence of abnormalities were noted. (AR 230.) Plaintiff's knee demonstrated no evidence of ecchymosis,[2] edema, atrophy, or effusion. (AR 230.) Plaintiff was deemed to be "neurovascularly intact." (AR 230.) Plaintiff exhibited "tenderness over the medial joint line with painful McMurray" and Plaintiff was "stable to anterior, posterior, varus, and valgus stresses."[3] (AR 230.) Dr. Schamblin reviewed radiographs, which consisted of four views of Plaintiff's knee, and all were within normal limits. (AR 230.) However, magnetic resonance imaging ("MRI") scan results demonstrated a complex tear of the medial meniscus on Plaintiff's left knee. (AR 231.) Dr. Schamblin recommended diagnostic knee arthroscopy with medial meniscectomy.[2] (AR 230.)

On September 17, 2007, Plaintiff underwent diagnostic knee arthroscopy with medial and lateral meniscectomies. (AR 226.) Following surgery, Plaintiff was examined by Dr. Schamblin on October 25, 2007, and it was noted that Plaintiff was doing very well and had no complaints. (AR 225.) On examination, trace effusion was demonstrated in Plaintiff's left knee. (AR 225.) Plaintiff walked with a mild antalgic gait with a loss of "a little bit of terminal extension." (AR 225.) Plaintiff was found to be mildly tender over the medial joint line in his left knee. (AR 225.)

Plaintiff appeared for a follow-up examination with Dr. Schamblin on December 5, 2007, and reported persistent knee pain. (AR 224.) Examination revealed tenderness to palpation directly over the medial collateral ligament on the femoral aspect of the left knee, but it was noted that Plaintiff retained a full range of motion. (AR 224.) Dr. Shamblin provided Plaintiff with a hinged knee brace, and administered a cortisone injection. (AR 224.) Plaintiff was advised to wear the brace at all times to protect his medial collateral ligament ("MCL").

---

[2] Ecchymosis refers to a small hemorrhagic spot in the skin forming a nonelevated, rounded or irregular, blue or purplish patch. *Dorland's Illustrated Medical Dictionary* 595 (31st ed. 2007).

[3] A McMurray's test is used to diagnose a meniscal tear. During the test, pressure is placed to compress the knee while the leg is rotated in and out to generate discomfort or pain. Pain or a click over the inner part of the joint may indicate a meniscal tear. *See http://www.nlm.nih.gov/medineplus/ency/article/001071.htm.*

[2] Meniscectomy refers to the excision of an intra-articular meniscus of the knee joint. *Dorland's Illustrated Medical Dictionary* 1151 (31st ed. 2007).

On January 10, 2008, Plaintiff was seen by Dr. Schamblin for a follow-up examination. (AR 223.)  Plaintiff reported that any forceful extension or pushing activities with the left knee caused him discomfort.  (AR 223.)  Plaintiff was found to have tenderness to palpation over the medial and lateral patellar facets and tenderness in the parapatellar region.  (AR 223.)  His quadriceps "demonstrated 1 to 2+ atrophy with associated weakness." (AR 223.) Plaintiff reported that he did not receive any significant improvement from the cortisone injection, and Dr. Schamblin recommended that Plaintiff continue his formal course of physical therapy.  (AR 223.)

Plaintiff presented for a follow-up examination with Dr. Schamblin on February 13, 2008. (AR 222.)  Plaintiff continued to experience pain in his left knee, but stated that with his recent physical therapy he was improving and seemed to be better than he had been in the four to five months prior.  (AR 222.)  On examination, Plaintiff's left knee was tender to palpation over the medial and lateral joint lines.  (AR 222.)  Dr. Schamblin recommended continuing with physical therapy to improve symptomatology.  (AR 222.)

On March 26, 2008, Plaintiff was again examined by Dr. Schamblin.  (AR 221.)  Plaintiff reported persistent severe patellofemoral pain in his left knee.  (AR 221.)  While Plaintiff continued to undergo physical therapy which provided some improvement in symptomatology, Plaintiff stated that he was continuing to experience difficulty with prolonged standing or sitting.  (AR 221.)  Dr. Schamblin provided the following plan:

> At this point in time, we will continue him on aggressive physical therapy with strengthening activities.  We have discussed the options for work including returning with restrictions, returning full duty or undergoing temporary disability.  I have informed him that the possibility of him becoming long-term disabled secondary to this knee is unlikely and that I would not provide this for him.  We have discussed this, and he understands.  All questions and concerns have been addressed.

(AR 221.)

On April 18, 2008, an email from Christy Reed at PG&E indicates that Plaintiff had recently been released back to work, but the release stated that Plaintiff could not kneel or crouch and could not stand more than 45 to 50 minutes.  (AR 216.)  As a result of these restrictions, the use of Plaintiff's kneeling chair was no longer possible.  (AR 216.)  Further, because Plaintiff could not

stand for more than 45 to 50 minutes, PG&E was unable to accommodate Plaintiff's physical restrictions.  (AR 216.)

On May 7, 2008, Plaintiff presented for a follow-up examination with Dr. Schamblin. (AR 220.)  Plaintiff reported that he continued to experience pain over the anterior aspect of the left knee.  (AR 220.)  Plaintiff also stated that physical therapy had not improved his symptoms, "the cortisone injection actually made him worse, and the nonsteroidal anti-inflammatory drugs [("NSAIDs")] seemed to have no effect."  (AR 220.)  Dr. Schamblin recommended that Plaintiff continue with a home exercise program, but he noted that he was "disheartened by the fact that [Plaintiff] has had this chronic long-term pain following a knee scope."  (AR 220.)  Dr. Schamblin indicated that he discussed with Plaintiff the importance of quadriceps strengthening and hamstring stretching activities, and noted that "[a]t this time, [he] did not feel [he] had anything more to offer [Plaintiff], so [he would] see him back on a p.r.n. [as needed] basis."  (AR 220.)

On July 24, 2008, Dr. Aileen R. Matuk referred Plaintiff for X-rays of his hips and pelvis. (AR 322.)  Two views of the hips showed mild degenerative changes.  (AR 322.)  The radiologist reported small dysplastic bumps at the femoral head/neck junction bilaterally as well as a mild bone fragment at the left superior acetabulum.  (AR 322.)  The radiologist noted that these findings can be associated with femoroacetabular impingement.  (AR 322.)

On September 17, 2008, Plaintiff was examined by a state agency consultative physician, Doojin Kim, M.D.  (AR 232-36.)  Plaintiff reported to Dr. Kim that he was experiencing constant dull pain since his knee surgery.  (AR 232.)  His pain became worse when sitting or standing more than 10 minutes or walking for several blocks.  (AR 232.)  Plaintiff also reported neck pain that started in 1992 following a car accident in which his car was rear-ended by another vehicle. (AR 232-33.) Upon examination, Dr. Kim noted that Plaintiff was unable to sit throughout the entire interview; after approximately five to 10 minutes, Plaintiff had to get up and stand to complete the examination with Dr. Kim.  (AR 233.)  While Dr. Kim noted that Plaintiff had no difficulty getting on and off the examination table, Plaintiff did exhibit mild difficulty getting up from the supine position.  (AR 233.)

Dr. Kim's general findings included paravertebral muscle spasm in Plaintiff's lumbosacral spine, no paravertebral muscle tenderness, crepitus in both knees with left worse than right, and some effusions over the lateral aspect of the left knee. (AR 235.) Dr. Kim diagnosed Plaintiff with lumbago,[3] chronic neck pain, bilateral knee arthritis, and bilateral knee pain. (AR 235.) Dr. Kim's functional assessment indicated that Plaintiff had limited range of motion in his cervical spine, lumbosacral spine, and both knees. (AR 235.) The signs exhibited upon examination were "suggestive of arthritis in both of his knees, his lower back, and cervical spine." (AR 235-36.)

Dr. Kim concluded that, based on his examination, Plaintiff would be expected to stand and walk for six hours in an eight-hour day with normal breaks and to sit six hours in an eight-hour day with normal breaks. (AR 236.) Dr. Kim reported that Plaintiff may benefit from a single point cane to help him with endurance over long distances and uneven terrain. (AR 236.) Plaintiff would be able to lift or carry 10 pounds frequently and 20 pounds occasionally; this limitation was due to knee and lower back pain. (AR 236.) Dr. Kim indicated that Plaintiff should avoid frequent bending, stooping, and crouching as these activities would exacerbate his lower back and knee pain. (AR 236.) Finally, Dr. Kim indicated that Plaintiff should avoid pushing or pulling objects greater than 25 pounds given that these maneuvers could exacerbate his lower back, neck, and bilateral knee pain. (AR 236.)

Radiology reports dated September 17, 2008, show severe degenerative disc disease at L5-S1. (AR 237.) The radiologist's findings also note slight narrowing and decreased stature of the L4-L5 disc and that the pedicles were short at L4-L5 consistent with spinal stenosis. (AR 237.) The radiologist listed an impression of degenerative disc disease and spinal stenosis. (AR 237.)

An undated letter from Dr. Matuk indicates that Plaintiff suffers from severe degenerative arthritis which predominantly involves his knees, low back, and both his elbows. (AR 250.) Dr. Matuk reported that Plaintiff has difficulty standing, walking, and sitting, and that Plaintiff is "unable to sustain activity for more than half an hour without suffering pain." (AR 250.) Dr. Matuk also reported that, while Plaintiff has been treated with "non steroidal, analgesics, physical therapy, and

---

[3] Lumbago refers to pain in the lumbar region. *Dorland's Illustrated Medical Dictionary* 1092 (31st ed. 2007).

surgery," Plaintiff has not "essentially improved." (AR 250.)  As a result, Dr. Matuk indicated that Plaintiff had developed depression and an anxiety disorder. (AR 250.)  Dr. Matuk concluded that Plaintiff "is permanently disabled." (AR 250.)

On October 3, 2008, state-agency nonexamining physician, P. Kammen, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity assessment form. (AR 239-47.)  Dr. Kammen opined that Plaintiff was able to occasionally lift 20 pounds and frequently lift 10 pounds; he could stand and/or walk for approximately six hours in an eight-hour day; could sit for a total of six hours in an eight-hour day; and could occasionally push or pull with his lower extremities. (AR 240.)  Dr. Kammen determined that Plaintiff was limited to only occasional balancing, stooping, or crouching; Plaintiff retained the ability to frequently kneel or crawl. (AR 241.)

On October 16, 2008, state-agency nonexamining physician Anthony Cirillo, M.D., reviewed Plaintiff's medical records as well as Dr. Kammen's assessment. (AR 246-47.)  Dr. Cirillo affirmed Dr. Kammen's opinion and the limitations stated. (AR 247.)  Plaintiff was examined again by Dr. Matuk in October and December 2008. (AR 280, 285.)

On January 14, 2009, state-agency nonexamining physician J. Mitchell, M.D., also reviewed Plaintiff's medical records and the opinions of Drs. Kammen and Cirillo. (AR 248-49.)  He opined that Plaintiff retained the ability to perform tasks with light exertion with no more than occasional lower-extremity forceful pushing or pulling. (AR 249.)

On January 30, 2009, Dr. Matuk referred Plaintiff for an MRI of his right knee. (AR 267.) The radiologist discussed his findings and presented an impression:

> 1. Horizontal tear of the posterior horn of the medial meniscus that appears to extend into the posterior aspect of the body of the medial mensicus. The lateral meniscus appeared intact.
>
> 2. Small joint effusion. Small popliteal cyst posterior to the medial compartment of the joint.
>
> 3. There are mild changes of chondromalacia[4] involving the patellofemoral and medial compartments of the joint.

---

[4] Chondromalacia refers to the softening of the articular cartilage, most frequently in the patella. *Dorland's Illustrated Medical Dictionary* 358 (31st ed. 2007).

(AR 267.) Plaintiff also underwent an MRI of his left knee to evaluate whether there was a recurrent tear. (AR 269.)  The radiologist interpreting the MRI provided the following findings:

> 1. There is evidence of previous partial meniscectomy and repair of the body and posterior horn of the medial meniscus.  There is residual truncation of the posterior horn close to the root attachment.  There is no indication of a recurrent tear.  The lateral meniscus appeared intact.
>
> 2. The ligamentous structures of the knee appear intact.
>
> 3. There are very minor changes of chondromalacia involving the articular cartilage of the patella.  Otherwise, there are no osteochondral abnormalities present.

(AR 269.)

In reviewing the MRI and radiology reports, Dr. Matuk completed a physical capacities evaluation form on February 25, 2009.  (AR 254-56.)  Dr. Matuk opined that, in an eight-hour day, Plaintiff could sit less than one hour and could stand or walk for one hour.  (AR 254.)  Dr. Matuk indicated that Plaintiff must alternate between sitting and standing.  (AR 254.)  Dr. Matuk opined that Plaintiff could only occasionally lift weight less than 10 pounds and could never lift any weight heavier than 10 pounds.  (AR 255.)  Plaintiff was limited to balancing only occasionally, and could never climb, stoop, kneel, crouch, or crawl.  (AR 255.)  Dr. Matuk concluded that Plaintiff suffers from fatigue to the extent that it prevents him from working full time, even in a sedentary position. (AR 255.)  Dr. Matuk also indicated that Plaintiff's pain from his knees, lumbar spine, and cervical spine prevented him from working full time, even in a sedentary position.  (AR 256.)  Dr. Matuk indicated that the pain Plaintiff experiences would interfere moderately to severely with his ability to concentrate and maintain attention.  (AR 256.)

Dr. Matuk also completed a form related to anxiety disorders.  (AR 258-65.)  Dr. Matuk opined that Plaintiff's emotional condition caused him to experience sleep disturbances, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating and thinking.  (AR 260.)  As to the degree of limitation these symptoms caused, Dr. Matuk indicated that Plaintiff was markedly limited in his activities of daily living and maintaining social functioning, but also indicated there

1  was insufficient evidence to determine whether Plaintiff suffered limitation in concentration,

2  persistence, and pace.[5]  (AR 260.)

3       Dr. Matuk referred Plaintiff to James Grimes, M.D., an orthopaedic specialist, for evaluation.

4  (AR 302-03.)  Following his examination of Plaintiff, Dr. Grimes sent a letter to Dr. Matuk on

5  March 12, 2009. (AR 302-03.)  Dr. Grimes' review of Plaintiff's knee X-rays showed "some very

6  minimal degenerative joint disease and to a lesser extent the right knee.  He has relatively good

7  preservation of the joint clear space height."  (AR 303.)  Dr. Grimes' treatment recommendation

8  included referring Plaintiff to a back specialist, considering arthroscopy of Plaintiff's hip with

9  osteochondroplasty of the femoral neck to remove hip impingement, right-knee arthroscopy in light

10  of the meniscal cartilage tear, and indicated that both knees would benefit from visco-

11  supplementation injections.  (AR 303.)

12  **B.  Administrative Proceedings**

13       The Commissioner denied Plaintiff's application initially and again on reconsideration;

14  consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 54-

15  68, 71-76.)  On June 17, 2010, ALJ Stephen W. Webster held a hearing where Plaintiff testified with

16  the assistance of counsel.  (AR 28-48.)

17       Plaintiff testified that he is not married, has no children, and lives with his brother in a house.

18  (AR 32.)  Plaintiff has a driver's license and drives himself to the doctor or the grocery store as

19  needed.  (AR 32.)  He also takes care of his personal grooming needs, cooks, does laundry, cleans

20  a little around the house, and does small amounts of work in the yard, although he noted that he had

21  a gardener as well as someone to help him clean the house.  (AR 33, 44.)  Plaintiff estimated that he

22  watches television approximately six hours per day, reads for a couple of hours, and spends an hour

23  or two on the computer.  (AR 33.)  Plaintiff also visits with family and friends and is able to attend

24  church, but does not go to the movies very often.  (AR 33.)  Plaintiff worked for PG&E until

25

26       [5] Dr. Matuk's opinion as to concentration appears internally inconsistent, noting on the one hand that Plaintiff

27  experiences difficulty concentrating and thinking (AR 260), yet also marked that there was insufficient evidence to determine whether Plaintiff suffered limitation in the area of concentration, persistence, and pace (AR 261.)  The Court

28  takes no position with regard to this apparent inconsistency and notes this only for clarity in setting forth the medical evidence.

September 14, 2007, but continued to work part time as the owner and operator of a business called Paradise Sound Company, a mobile DJ business. (AR 34.) When he became disabled, Plaintiff had already entered into contracts to perform services at weddings. (AR 34.) He had approximately 12 dates already scheduled at the time he became disabled, so he had a friend take over the commitments that the friend could accommodate; for the remainder of the obligations, Plaintiff's friend helped him set up and take down the equipment. (AR 34.) Once Plaintiff fulfilled his pre-existing contractual commitments, he did not continue with the business. (AR 34.)

Plaintiff experiences pain in his right hip and left knee, and both the meniscus are torn in each knee. (AR 37.) Also, Plaintiff's neck and shoulders bother him as a result of a car accident in 1992. (AR 37.) Plaintiff originally injured his back in 1985, and his doctors told him at that time he would not work again due to his limited ability to stand or sit due to back pain. (AR 37.) However, Plaintiff made adjustments to be able to kneel on a stool to perform his work, and ultimately his employer provided him with a kneeling chair. Eventually, the kneeling injured Plaintiff's knees, and he was unable to use the kneeling chair. (AR 37-38.)

Plaintiff's primary physician is Dr. Matuk who Plaintiff sees approximately three times a year. She assesses his condition and sends him to specialists, if necessary. (AR 38.) Plaintiff is prescribed pain medication; uses a hot tub approximately 30 minutes twice a day as therapy; uses a neck traction device and an inversion table, and stretches. (AR 39.) As a result of Plaintiff's pain, he can only sit in a chair for 15 minutes until it becomes uncomfortable. (AR 39.) So long as he can shift his weight from side to side, he can stand for approximately 15 minutes. (AR 39.) He can only walk approximately 100 yards before he experiences pain. (AR 39.) The heaviest weight he can lift is five to 10 pounds, depending on how the weight is held. (AR 40.) He uses a cane for balance, which was not prescribed, but it helps to alleviate some of the weight on his hip. (AR 40.) Plaintiff reported that he has atrophy in his left thigh due to injury from his left knee. (AR 41-42.) On an average day, on a scale from one to 10 with zero indicating no pain, Plaintiff experiences pain at a five to an eight. (AR 43.) Plaintiff is currently taking Soma and Vicodin for his pain, and he has also tried Ultram but it did not help. (AR 43.)

A vocational expert ("VE") also testified.  The VE characterized Plaintiff's work at PG&E as that of a utility clerk, which is considered skilled and light work.  (AR 45-48.)  The ALJ posed several hypotheticals to the VE for consideration.  In the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education, and work history.  (AR 45.)  This person could lift 20 pounds occasionally and 10 pounds frequently; could stand and/or sit, stand and/or walk six out of eight hours; could occasionally stoop, crouch, kneel, or crawl; and would need to use a cane for long distances or over rough terrain.  (AR 45.)  The VE testified that such a hypothetical person could perform Plaintiff's past relevant work and work in the national economy.  (AR 45.)

In a second hypothetical, the ALJ asked the VE to assume a person with the same limitations as the first hypothetical person but with the added limitation of needing to be able to sit or stand at will.  (AR 46.)  The VE testified that such a person could perform Plaintiff's past relevant work. (AR 46.)

In a third hypothetical, the ALJ asked the VE to assume the same factors as presented in the first and second hypotheticals, but also to assume that such a person could do less than occasional kneeling or crouching.  The VE testified that such a person could perform Plaintiff's past relevant work.  (AR 46.)

The ALJ posed a fourth hypothetical asking the VE to assume a person with the same limitations as set forth in hypotheticals one through three, but also to assume a person who could not complete an eight-hour day or a 40-hour week.  (AR 46.)  The VE testified that such a person could not perform Plaintiff's past relevant work or any work in the regional and national economy.  (AR 46.)

Plaintiff's counsel also posed hypotheticals for the VE's consideration.  Plaintiff's representative asked the VE to suppose a person who could sit for no more than an hour and could do no pushing or pulling with the upper or lower extremities; could perform no fine manipulation; could not use foot controls bilaterally; could only occasionally lift up to 10 pounds, but could lift no amount of weight frequently.  The hypothetical person was also assumed to suffer from documented fatigue and pain ranging from moderate to severe, which would preclude concentration for even

simple, unskilled work "some of the time." (AR 47.) The VE testified that a hypothetical person with these limitations would not be employable in any labor market. (AR 47.)

Finally, counsel asked the VE to consider a hypothetical person who had to take up to five unscheduled work breaks per day lasting anywhere from five to 15 minutes. The VE testified that such a person would not be employable. (AR 47.)

On July 1, 2010, the ALJ issued a decision, finding Plaintiff not disabled since September 14, 2007, through the date of the decision. (AR 15-22.) Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset date of September 14, 2007; (2) has the following impairment or a combination of impairments that is considered "severe" based on the requirements in the Code of Federal Regulations: degenerative disc disease and degenerative joint disease of the hip and knee; (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) has the residual functional capacity ("RFC")[6] to lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk for six hours in an eight-hour workday, sitting and standing at will; occasionally stoop or crawl and less than occasionally kneel or crouch; and must use a cane for long distance or rough terrain; (5) is capable of performing his past relevant work as a utility clerk; and (6) is not disabled as defined by the Act. (AR 15-22.) Plaintiff sought review of this decision before the Appeals Council. (AR 9-11.) On June 9, 2011, the Appeals Council denied review. (AR 1-4.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

---

[6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

**C.    Plaintiff's Appeal**

On August 3, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  Plaintiff argues that the ALJ failed to provide legally sufficient reasons to reject Plaintiff's testimony about the severity and extent of his pain and limitations.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

**A.    The ALJ's Consideration of Plaintiff's Credibility**

**1.        Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets

14

1  the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony

2  about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the

3  rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

8  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks

9  omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009);

10  20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work

11  record and testimony from physicians and third parties concerning the nature, severity, and effect of

12  the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

13  ## 2.   The ALJ's Credibility Determination is Not Legally Sufficient

14  The ALJ did not find any evidence of malingering and determined that Plaintiff's medically

15  determinable impairments could reasonably be expected to cause the alleged symptoms; however,

16  the ALJ also found that Plaintiff's statements concerning the intensity, persistence, and limiting

17  effects of these symptoms "are not fully credible to the extent they are inconsistent with the [RFC]."

18  (AR 21.) The ALJ was therefore required to provide clear and convincing reasons for rejecting

19  Plaintiff's testimony regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms.

20  *Vasquez*, 572 F.3d at 591.

21  The ALJ provided the following reasons to discredit Plaintiff's statements regarding the

22  intensity, persistence, and limiting effects of Plaintiff's symptoms:

> A careful review of the record does not support the severity of the claimant's alleged limitations. The claimant has a documented history of medical problems and restrictions. However, the objective medical findings reveal only *mild* degenerative changes at the hips [emphasis added] (Exhibit 14F, page 1); *mild* changes of chondromalacia of the bilateral knees (Exhibit 10F, pages 17, 21-22); and *no indication of a recurrent tear* of the left knee [emphasis added] (Exhibits 10F, page 19; 13F, pages 10-11). Further, he only sees his primary care physician Dr. Matuk three times a year according to his testimony. The claimant's admissions regarding his ability to take care of himself and his dogs and perform a variety of activities of daily living are inconsistent with his allegations of incapacitating impairments and pain. He admitted he was able to care for his own needs as to bathing, dressing and

15

1   grooming, able to do housework and some yard work, able to drive, go to church, use
2   a computer for several hours a day, and visit with friends and family.  In addition, he
3   admitted he worked in 2007 to 2008 doing some events for his DJ company.  While
    the work was not substantial and gainful activity, and he testified a friend set up and
    took everything down for him, his ability to perform a wide variety of activities of
4   daily living indicate that his [claims] of incapacitating impairments are overstated.

5   (AR 21.)

6          **a.**    **The ALJ's Consideration of the Objective Medical Evidence**

7   Plaintiff argues that it "appears that the ALJ is rejecting [Plaintiff's] testimony based on a

8   belief that the testimony is not credible because it lacks support in the objective medical evidence,"

9   yet such rationale is legally insufficient pursuant to *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir.

10  1991) (en banc).  (Doc. 19, 12:12-13.)  Moreover, the regulations specifically prohibit rejecting

11  subjective pain testimony solely due to a lack of corroborating objective medical evidence.  Finally,

12  according to Plaintiff, even if the ALJ correctly considered the medical evidence in assessing

13  Plaintiff's pain testimony, the objective medical evidence *supports* Plaintiff's testimony rather than

14  detracts from it.  (Doc. 19, 14:1-6.)  However, instead of considering the portions of the medical

15  records that support Plaintiff's credibility, the ALJ improperly isolated a select quantum of evidence

16  from the records the ALJ found detracts from Plaintiff's credibility.

17  The Commissioner responds that the ALJ provided numerous valid reasons for discounting

18  Plaintiff's allegations regarding the extent, persistence, and limiting effect of his symptoms.  (Doc.

19  20, 7:13-14.)  The ALJ considered that the objective medical findings only revealed "mild"

20  degenerative changes in Plaintiff's hips and knees.  The Commissioner cites *Batson v. Comm'r*,

21  359 F.3d 1190, 1196 (9th Cir. 2004) for the proposition that, while a lack of objective medical

22  findings corroborating the degree of pain may not be the only reason to discount Plaintiff's subjective

23  pain testimony, it may be considered in conjunction with other evidence in the record, which is how

24  it was considered in this case.  (Doc. 20, 7:17-22.)  In addition to the lack of objective medical

25  evidence corroborating the degree of pain and limitation Plaintiff alleged, the ALJ also considered

26  the extent and type of Plaintiff's pain treatment, his daily activities, his continued work in his DJ

27  business after the alleged onset date of his disability, and the record as a whole.  (Doc. 20, 7:27-9:4.)

28

1      The Commissioner is correct that an ALJ does not err in considering a lack of objective

2  medical evidence to support lay testimony as to the degree of a claimant's pain, so long as this is not

3  the sole basis for an adverse credibility finding.  *See Batson*, 359 F.3d at 1196.  As set forth in

4  20 C.F.R. § 404.1529(c)(2), objective medical evidence "is a useful indicator to assist" the agency

5  in making "reasonable conclusions about the intensity and persistence of [a claimant's] symptoms

6  and the effect those symptoms, such as pain may have on [a claimant's] ability to work."  However,

7  § 404.1529(c)(2) also provides that the agency will not reject a claimant's statements regarding the

8  intensity and persistence of pain symptoms or who those symptoms affect a claimant's ability to work

9  "solely because the available objective medical evidence does not substantiate [the claimant's]

10  statements."

11      Here, the ALJ reasoned that, while Plaintiff "has a documented history of medical problems

12  and restrictions," the "objective medical findings reveal only *mild* degenerative changes at the hips

13  . . . *mild* changes of chondromalacia of the bilateral knees . . . and *no indication of a recurrent tear*

14  *of the left knee . . . .*" (AR 21.)  Plaintiff argues that in considering these mild findings, the ALJ

15  ignored other medical evidence that supported his pain testimony.  For example, Plaintiff contends

16  the ALJ ignored Dr. Schamblin's May 2008 report where he stated he was "disheartened" by

17  Plaintiff's continued knee pain, that Dr. Schamblin had placed Plaintiff on aggressive physical

18  therapy, and that Dr. Schamblin administered a cortisone injection to Plaintiff's knee.  (Doc. 19,

19  14:7-14.) Plaintiff argues the ALJ also ignored Dr. Kim's orthopedic opinion indicating that Plaintiff

20  ambulated with rigidity in his lower back, that he needed to sit and stand during the examination,

21  exhibited mild difficulty getting up from a supine position during the examination, and had a

22  paravertebral muscle spasm in his lumbosacral spine.  Plaintiff contends that the ALJ ignored Dr.

23  Kim's opinion that Plaintiff has objective findings to support Plaintiff's claims of chronic low back,

24  neck, and bilateral knee pain.  (Doc. 19, 14:20-23 (citing AR 235).)

25      As it pertains to Dr. Kim's examination notes and Plaintiff's assertion that the ALJ ignored

26  that evidence, Dr. Kim opined that Plaintiff could lift 20 pounds occasionally and 10 pounds

27  frequently and could sit, stand and/or walk six hours in an eight-hour workday even in light of the

28  fact that Plaintiff needed to sit and stand during the examination, exhibited mild difficulty getting

1   up from a supine position during the examination, and had paravertebral muscle spasm in the

2   lumbosacral spine.  (AR 232-36.)  In other words, the objective examination findings convinced Dr.

3   Kim that Plaintiff could perform exertional activities that Plaintiff stated he could not perform.  The

4   ALJ was thus entitled to give this opinion weight and find that the objective medical findings did

5   not support Plaintiff's lay assertions regarding the severity of his condition.  As it pertains to the

6   aggressive physical therapy to which Dr. Schamblin referred Plaintiff and the administration of a

7   cortisone shot, even to the extent this evidence supports Plaintiff's credibility, the Court is not

8   empowered to weigh the evidence in the first instance.  The ALJ was entitled to consider the mild

9   objective findings and determine that these findings undercut Plaintiff's testimony regarding the

10  extent of his pain and limitations.

11      As noted above, however, objective medical findings that do not corroborate the extent of

12  Plaintiff's pain cannot be the sole reason to reject Plaintiff's lay statements.  20 C.F.R. § 1529(c)(2).

13  Thus, the Court considers the rest of the ALJ's reasons for rejecting Plaintiff's credibility.

14              **b.      Daily Activities**

15      Plaintiff argues that the ALJ improperly discounted his pain testimony based on Plaintiff's

16  daily activities.  (Doc. 19, 16:6-15.)  Specifically, Plaintiff contends that the ALJ faults him unfairly

17  "for attempting to maintain some semblance of normalcy in his life in performing minimal activities

18  of daily living."  (Doc. 19, 16:6-8.)  Plaintiff quotes *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th

19  Cir. 1989) for the assertion that evidence that a claimant can "participate in basic human functions

20  'is not determinative of disability.'" (Doc. 19, 16:8-9.)  The mere fact that Plaintiff can perform some

21  activities is not a legally sufficient reason to discount Plaintiff's pain testimony; instead, to be a

22  legally sufficient reason to discount such testimony, an individual's daily activities must be

23  inconsistent with the claimed limitations.

24      The Commissioner contends that the ALJ properly considered Plaintiff's daily activities,

25  including that Plaintiff was able to take care of himself, as well as his two dogs, and perform a

26  variety of activities including housework, some yardwork, driving himself around, visiting friends

27  and family, and using his computer for up to two hours per day.  (Doc. 20, 8:8-15.)

28

"The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits [citations omitted] and many home activities are not easily transferrable to what may be the more grueling environment of the workplace." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.2001). In other words, "an ALJ may not reject a claimant's testimony simply because she engages in minimal daily activities despite her impairments." *Jimenez v. Astrue*, No. CV 08-08403-MLG, 2009 WL 2589780, at *4 (C.D. Cal. Aug. 21, 2009) (citations omitted). "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Cooper v. Bowen*, 815 F.2d 556, 561 (9th Cir.1987) (citation omitted).

Rather, it is only where the level of activity is inconsistent with a claimed limitation that the activity has any bearing on credibility. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Daily activities, therefore "may be grounds for an adverse credibility finding if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (citations and internal quotation marks omitted). "[T]o conclude that a claimant's daily activities warrant an adverse credibility determination[,]" however, "[t]he ALJ must make specific findings relating to [the daily] activities and their transferability[.]" *Id*. (citation and internal quotation marks omitted) (emphasis added).

The ALJ considered Plaintiff's testimony regarding his ability to care for himself and his dogs and perform a variety of activities of daily living to be inconsistent with Plaintiff's allegations of incapacitating impairments and pain. (AR 21.) The ALJ reasoned that Plaintiff "admitted he was able to care for his own needs as to bathing, dressing and grooming, able to do housework and some yardwork, able to drive, go to church, use a computer for several hours a day, and visit with friends and family." (AR 21.)

None of Plaintiff's reported daily activities necessarily conflict with the pain and limitations Plaintiff stated he experiences. Plaintiff testified that his pain limits him to lifting only five to 10

pounds, and he can only sit or stand for 15 minutes at one time.  (AR 39.)  These limitations would not necessarily prevent a person from performing personal grooming activities, or from cooking or doing laundry.  Moreover, activities such as watching television, reading, or using a computer are only relevant to the extent Plaintiff performs these activities in a manner inconsistent with his claimed limitations – e.g., that he does all of these things while sitting or standing for more than 15 minutes at a time.  Without any further information about how Plaintiff performs these activities, the mere fact that he engages in them does not bear on Plaintiff's credibility.  Further, the record does not supply evidence of how these activities were performed such that the ALJ's conclusions can be found to be supported by substantial evidence.  As presented and discussed by the ALJ, Plaintiff's daily activities do not present a clear and convincing reason to discount Plaintiff's credibility.

### c.       Treatment by Plaintiff's Primary Physician

The Commissioner argues that the ALJ properly considered the type and extent of Plaintiff's pain treatment, noting that Plaintiff admitted he only saw his treating physician, Dr. Matuk, three times a year and that she prescribed medication that provided pain relief.  (Doc. 20, 7:27-8:1.)  The Commissioner contends that where a claimant only seeks and obtains conservative treatment, the ALJ validly discounts his claims of severe and debilitating symptoms.  (Doc. 20, 8:2-8.)

The ALJ determined Plaintiff's lay testimony regarding the severity of his pain was overstated because Plaintiff reported only seeing his primary care physician, Dr. Matuk, three times a year for pain management.  (AR 21.)  In the context of Plaintiff's medical records, this reason is a legally insufficient basis to discredit Plaintiff.  Plaintiff explained at the hearing that he sees Dr. Matuk approximately three times a year so that she can re-fill his prescriptions and refer him to specialists.  (AR 38.)  In 2007, Dr. Matuk referred Plaintiff to Dr. Schamblin, an orthopedic specialist, after Plaintiff reported knee pain.  (AR 228-29.)  Plaintiff was then treated by Dr. Schamblin until May 2008 when Dr. Schamblin stated that he had nothing more to offer Plaintiff.  (AR 219-28.)

In October and December 2008, Plaintiff was again examined by Dr. Matuk after reporting continued pain in his knees.  (AR 280, 286.)  In January 2009, at a follow-up examination where Plaintiff again reported continuing knee pain, Dr. Matuk referred Plaintiff for a left-knee arthrogram, and MRIs of both his left and right knees.  (AR 271-73, 276, 277, 280.)  The MRI's indicated no new

tear in Plaintiff's left knee, but did show a new meniscus tear in his right knee.  (AR 271-73.)  Dr. Matuk then referred Plaintiff to Dr. Grimes, an orthopedic specialist, who recommended surgery on Plaintiff's right knee and noted that both knees would benefit from visco-supplementation injections.  (AR 302-03.)  Plaintiff continued to see Dr. Matuk throughout 2009 and into 2010 to receive prescription medication for his pain.  (AR 304, 306, 316, 311.)  It is not clear how the frequency of Dr. Matuk's treatment of Plaintiff weighs against Plaintiff's credibility because it is not clear what treatment Plaintiff should have sought, but did not seek, from Dr. Matuk.

As Plaintiff testified, Dr. Matuk was his general practitioner who referred him to specialists based on his continued reports of pain and limitation.  (AR 38.)  Although articulated in the Commissioner's brief on appeal, the ALJ did not assert that Plaintiff was not credible because the treatment by Dr. Matuk was too conservative; rather, in discussing the number of times that Plaintiff saw Dr. Matuk, the ALJ seemed to be indicating that Plaintiff would have been seeking more frequent treatment from Dr. Matuk had he actually been as debilitated by pain as he testified.  However, the ALJ does not discuss what more frequent examinations with Dr. Matuk would have accomplished, particularly as she was not a specialist, as the ALJ noted.  Moreover, the evidence does not suggest that Plaintiff failed to follow-up with Dr. Matuk as ordered or missed scheduled appointments.  In sum, it is unexplained why Plaintiff's treatment frequency by Dr. Matuk weighs against his credibility when the record shows that Plaintiff saw Dr. Matuk regularly to renew his pain medication prescriptions, and Dr. Matuk ordered X-rays and MRIs and referred Plaintiff to specialists for treatment of his continuing back, hip, and knee pain over the course of the treating relationship.  This is not a clear and convincing basis supported by substantial evidence to reject Plaintiff's lay statements.

### d.   Work Performed After Alleged Onset of Disability

Plaintiff argues that the ALJ improperly considered his post-disability work as a DJ in assessing Plaintiff's credibility. (Doc. 19, 18:3-19:14.) Plaintiff argues that his testimony establishes that he did not solicit new business once his disability began, he merely fulfilled his pre-existing commitments to perform work as a DJ; thus, this evidence actually enhances his credibility rather than detracts from it.  (Doc. 19, 18:3-19:14.)

1    The Commissioner asserts that the ALJ properly considered Plaintiff's work in his DJ
2  business, finding that such work indicated that Plaintiff overstated the incapacitating nature of his
3  impairments.  (Doc. 20, 8:16-22.)

4    Plaintiff testified at the hearing that he owned and operated a business called Paradise Sound
5  Company, a mobile DJ company.  (AR 35.)  When he became disabled, he had contracts to perform
6  work as a DJ by providing music at special events.  (AR 35.)  Plaintiff explained that he performed
7  these services at wedding receptions, and the contracts were usually entered into six to twelve
8  months in advance.  (AR 35.)  As a result, when Plaintiff became disabled, he was contracted to
9  perform 12 events.  (AR 35.)  Plaintiff had a friend help him set up and take down the equipment
10  necessary to perform the contracts, and his friend took over a couple of the scheduled events.
11  (AR 35.)  Plaintiff completed the remaining scheduled events and then stopped working as a DJ.
12  (AR 35.)  The ALJ determined that, while this work was not substantial, gainful activity, and
13  although Plaintiff testified that his friend set up and took down the related equipment for him, the
14  ability to work post-alleged disability onset date in conjunction with his daily activities, indicate that
15  Plaintiff's claim of incapacitating impairments was overstated.  (AR 21.)

16    While the Commissioner is correct that this is the type of evidence that an ALJ may consider
17  in making a credibility determination (*see Tommasetti*, 533 F.3d at 1039), here the ALJ's finding is
18  essentially a conclusion with no explanatory rationale and lacks support in the record.  While it
19  appears that the ALJ considered Plaintiff's post-disability work activity in conjunction with Plaintiff's
20  daily activities, there is no discussion of how this limited work showed that Plaintiff was less limited
21  than he testified.  The record does not reflect what type of postural or exertional activities were
22  required with regard to Plaintiff's DJ business or how long Plaintiff undertook any specific activity
23  to complete the work.  Plaintiff also testified that his friend handled all the equipment necessary to
24  perform the work, which corroborates Plaintiff's testimony that he was unable to lift much weight.
25  While the ALJ is generally entitled to consider evidence of Plaintiff's activities in making a
26  credibility determination,  the ALJ must explain why the evidence cuts against Plaintiff's subjective
27  testimony regarding his pain.  The ALJ provides no discussion of how the DJ work was performed
28  but merely points to the fact that Plaintiff engaged in it; there is no substantial evidence indicating

that the manner in which this work was performed was contrary or inconsistent with Plaintiff's stated limitations and pain.  This is not a clear and convincing reason to discount Plaintiff's testimony about the severity and extent of his pain and limitations.

### e.    Plaintiff's Work History

Citing 20 C.F.R. § 404.1529(c)(3), Plaintiff asserts that the ALJ was required to consider Plaintiff's 30-year work history in assessing Plaintiff's credibility, but the ALJ's decision "is lacking in any true consideration of [Plaintiff's] work history."  (Doc. 19, 17:20-18:2.)

Generally, Plaintiff's 30-year work history supports his overall credibility.  Were the Court assessing Plaintiff's credibility in the first instance, it might weigh this evidence heavily in Plaintiff's favor.  However, Plaintiff's continuous and lengthy work record is only one factor that an ALJ may consider in making the credibility determination.  To the extent that the ALJ found other factors to be more determinative of Plaintiff's credibility, the Court may not engage in second guessing.

In *Fair*, the Ninth Circuit discussed the court's role in reviewing the ALJ's credibility determination:

> The ALJ used the limited tools at his disposal to evaluate the nonmedical evidence and found [the claimant's] complaints of disabling pain not credible.  He could easily have relied on other nonmedical evidence in the record to reach the opposite conclusion. [The claimant] attempted to work in 1981, but testified that his pain forced him to stop.  He testified that he is unable to walk more than the shortest distances, suffers from pain-induced fatigue that frequently forces him to stop what he is doing and lie down, and often has difficulty maintaining his balance.  It may well be that a different judge, evaluating the same evidence, would have found [the claimant's] allegations of disabling pain credible.  But, as we reiterate in nearly every case where we are called upon to review a denial of benefits, we are not triers of fact.  Credibility determinations are the province of the ALJ.  *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.

885 F.2d at 604.  Here, the ALJ could have relied on Plaintiff's 30-year work history and concluded it supported his credibility.  However, the fact that the ALJ did not ascribe this evidence great weight in assessing Plaintiff's credibility is not legal error, and, as discussed in *Fair v. Bowen*, the Court is not empowered to weigh this evidence in the first instance and second-guess the ALJ's refusal to give it dispositive weight.  *Id.*

1

            **f.      Conclusion**

2      In reviewing the reasons offered by the ALJ to reject Plaintiff's credibility, only the ALJ's

3   reference to the mild objective medical findings was appropriate and supported by substantial

4   evidence.  However, that reason cannot stand alone as a legally sufficient basis to reject Plaintiff's

5   statements about his pain and limitations. *See Batson*, 359 F.3d at 1196; 20 C.F.R. § 404.1529(c)(2).

6   Thus, the errors in assessing Plaintiff's credibility cannot be found harmless, and the matter must be

7   remanded for further consideration.

8   **B.     The ALJ's Consideration of Dr. Matuk's Opinions**

9      While this issue was not addressed by Plaintiff,[7] there is an inconsistency in the ALJ's

10  consideration of Dr. Matuk's opinions that convinces the Court that they should be reconsidered on

11  remand.[8]  Specifically, the ALJ rejected Dr. Matuk's opinion in large part because Dr. Matuk's

12  opinions were ostensibly rendered in 2005, two years before Plaintiff claimed to be disabled.

13  (AR 19.)   However, these medical records are dated February 25, 2009, not 2005 as the ALJ

14  indicates.  (AR 19.)  Moreover, the table of contents to the administrative record indicates that the

15  records cited by the ALJ, specifically Exhibit 10F, were dated between October 31, 2008, and March

16  12, 2009, not 2005.[9]  While the ALJ also determined that Dr. Matuk's opinions were not supported

17  by objective findings or the evidence as a whole, and rejected the opinions because Dr. Matuk is not

18  a specialist, it is difficult to determine how much the incorrectly identified date corrupted the

19  evaluation and weight ascribed to Dr. Matuk's opinions.   Fairness dictates that the ALJ again

20  consider Dr. Matuk's opinions on remand.

21

22  —————————————

23      [7] Plaintiff asserted, as part of his credibility argument, that the ALJ improperly rejected the opinions of Drs.
    Schamblin, Kim, and Matuk that Plaintiff suffers from pain as a result of his severe impairments.  (Doc. 19, 15:14-16:5.)

24  However, the ALJ accepted that Plaintiff's impairments could cause pain; rather, the ALJ rejected the *degree* of pain that
    Plaintiff asserted he suffered.

25      [8]  The Court takes no position on how Dr. Matuk's opinions should be weighed on remand, but the opinions

26  are mistakenly characterized in prejudicial manner such that they must be reconsidered.

27      [9] Dr. Matuk's handwritten date is extremely difficult to decipher on particular pages, and the "2009" does tend
    to look like "2005."  However, when reviewed in context, the dated documents are part of two assessments made on

28  February 25, 2009, i.e., a physical capacities evaluation (AR 254-57) and an assessment of Plaintiff's mental functional
    capacity (AR 265).

1    **C.      Remand is Warranted**

2           "The court shall have power to enter, upon the pleadings and transcript of the record, a

3    judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

4    with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In Social Security cases,

5    the decision to remand to the Commissioner for further proceedings or simply to award benefits is

6    within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If

7    additional proceedings can remedy defects in the original administrative proceedings, a social

8    security case should be remanded.  Where, however, a rehearing would simply delay receipt of

9    benefits, reversal [and an award of benefits] is appropriate."  *Id.* (alteration in original) (internal

10   quotation marks omitted).

11          The Court has concluded that the ALJ erred in failing to give clear and convincing reasons

12   for discrediting Plaintiff's lay testimony regarding the extent of his limitations.  Additionally, it

13   cannot be ascertained whether Dr. Matuk's 2009 opinions were weighed properly because the dates

14   ascribed by the ALJ to the opinions was erroneous – i.e., the incorrect dates noted by the ALJ were

15   cited as a reason to reject the opinions.   In these circumstances, it is appropriate to remand this

16   matter for further administrative proceedings.  "Remand for further administrative proceedings is

17   appropriate if enhancement of the record would be useful."  *Benecke v. Barnhart*, 379 F.3d 587, 593

18   (9th Cir. 2004); *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Where there are

19   outstanding issues that must be resolved before a determination of disability can be made, and it is

20   not clear from the record that the ALJ would be required to find the claimant disabled if all the

21   evidence were properly evaluated, remand is appropriate.  *Cf. Benecke*, 379 F.3d at 593; *Harman*,

22   211 F.3d at 1178.  Here, remand is appropriate because the ALJ must properly address Plaintiff's

23   credibility and Dr. Matuk's opinions before an appropriate disability determination can be made. *See*

24   *Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009).

25                                                **CONCLUSION**

26          After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the

27   record, the Court finds that the ALJ's decision is not supported by substantial evidence and is,

28   therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with

this order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff JOHN E.

THOMAS, and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:      January 16, 2013**                            /s/ Sheila K. Oberto
                                                UNITED STATES MAGISTRATE JUDGE